FILED
2010 Mar-22  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CHEKITA COLVIN** *on behalf of* **T.T.S.,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | **CV-08-BE-2069-S** |
| **v.** ] | |
| ] | |
| **SOCIAL SECURITY ADMINISTRATION, Commissioner,** ] | |
| ] | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Claimant's[1] mother, Chekita Colvin, filed an application for Supplemental Security Income payments ("SSI") on behalf of her son T.T.S. on September 29, 2005.  T.T.S. claimed disability because of attention deficit hyperactivity disorder ("ADHD"), disruptive disorder, and depression disorder with an onset date of August 31, 2005.

Initially, the Social Security Administration denied T.T.S.'s application for benefits.  As a result, T.T.S. requested a hearing.  The Claimant appeared and testified at a hearing held on December 7, 2007 in Birmingham, Alabama.  The Claimant's mother also appeared and testified on behalf of him.  On March 29, 2008, the ALJ denied benefits as well.  The Appeals Council denied T.T.S.'s request for review on September 4, 2008.  The ALJ's decision thus became the Commissioner's final decision on that date.

Claimant T.T.S. timely pursued and exhausted his administrative remedies available

---

[1]For purposes of this opinion, the Claimant will be T.T.S., the child, rather than his mother because the legal standards apply to him and his impairments.

before the Commissioner.  Thus, this court has jurisdiction under 42 U.S.C. § 405(g).  For the reasons stated below, the court will affirm the decision of the Commissioner.

## ISSUES PRESENTED

In this appeal, T.T.S. argues that the Commissioner erred in three ways.  First, T.T.S. alleges that the ALJ's finding that T.T.S. has a major problem with non-compliance cannot be based on substantial evidence.  Second, T.T.S. asserts that the ALJ failed to accord proper weight to the opinion of T.T.S.'s treating psychiatrist.  Third, T.T.S. contends that the ALJ made improper credibility findings.

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether the ALJ applied proper legal standards. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end, this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.*  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*

This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applied the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial

evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *See Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## LEGAL STANDARD

For a child (a person under 18) to qualify for disability benefits and establish his entitlement for a period of disability, he must be disabled as that term is defined under the Social Security Act and its Regulations.  Under the Regulations, for a child to be found disabled, he must "have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R 416.906 (2009).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.  An impairment or combination of impairments causes marked and severe functional limitations if it 1) meets or medically equals in severity the set of criteria for an impairment listed in the Listing of

Impairments (the Listing), or 2) is functionally equal in severity to a listed impairment. 20 C.F.R. § 416.924(d).  Thus, to be considered disabling, a child's impairment or combination of impairments must meet, medically equal, or functionally equal a section of the Listing of impairments, 20 C.F.R. § 404, Subpt. P, App. 1.  In the instant case, T.T.S. claims he is disabled because his mental impairments are functionally equal to impairments in the Listing.

To be functionally equivalent in severity to one or more of the listed impairments, a claimant's impairments must cause the same functional limitations as those described in a listed impairment, i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).  A "marked" limitation is a limitation that interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities, and is more than moderate. *See* 20 C.F.R. § 416.926a(e)(2)(I). An "extreme" limitation is reserved for the worst limitations and is a limitation that interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities, but does not necessarily mean a total lack or loss of ability to function. *Id.* at § 416.926a(e)(3)(I).

The ALJ should determine the character of a claimant's limitation(s) by considering a claimant's limitation of specific function, broad areas of development or function, episodic impairments, and limitations related to the effects of treatment or medication. 20 C.F.R. § 416.926a(b). The ALJ evaluates children between the ages of 3 and 18 in terms of cognitive and communicative development, motor development, social development, personal development, and concentration, persistence, and pace; disability is established if the child has an extreme degree of restriction in one area of functioning or marked limitation in two areas of functioning. 20 C.F.R. § 416.926a(b)(2).

4

The Regulations set out the criteria for functional equivalence to a listing in 20 C.F.R. § 416.926a. That regulation requires consideration of six domains, which are broad areas of functioning intended to capture all of what a child can and cannot do. 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or marked limitations in two of the domains. *Id.* at § 416.926a(d).  On this appeal, Claimant T.T.S. challenges the ALJ's findings regarding two functional domains: attending and completing tasks, and interacting and relating to others.

The Regulations provide a three-step sequential determinative process for children rather than the five-step process used for adults. The ALJ must determine whether

> 1) The child is engaged in substantial gainful activity.
> 2) The child has a medically determinable severe impairment or combination of impairments.
> 3) The impairment meets, or is medically equal to, or is functionally equal to an impairment included in the Listing of Impairments in Appendix 1 of Subpart P of the Regulations.

20 C.F.R. § 416.924(a)-(d).  If the answer to the first question is "no" and to the remaining two is "yes," then a finding of disability is required.

When a claimant has multiple impairments, the ALJ must consider the impairments in combination. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984). Even if the claimant's *individual* impairments are not disabling, the ALJ must "make specific and well-articulated findings . . . to decide whether the *combined* impairments cause the claimant to be disabled." *Id.*

5

(emphasis added).

A three-part "pain standard" applies when a claimant attempts to establish disability through his own testimony of subjective symptoms.  The pain standard requires:  (1) evidence of an underlying medical condition, and *either* (2) objective medical evidence that confirms the severity of the alleged symptom arising from that condition, *or* (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1999) (reciting the requirements of the three-part "pain standard").

Once such an impairment is established, the ALJ must consider all evidence about the intensity, persistence, and functionally limiting effects of the claimant's symptoms in addition to the medical signs and laboratory findings in deciding the issue of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 416.929(c) describes the kinds of evidence, including the factors listed below, that the ALJ must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1.  The claimant's daily activities;

2.  The location, duration, frequency, and intensity of the claimant's symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms;

5.  Treatment, other than medication, the claimant receives or has received for relief from symptoms;

6.  Any measures other than treatment the claimant uses or has used to relieve his symptoms; and

7.  Any other factors concerning the claimant's functional limitations and restrictions because of his symptoms.

"The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *accord Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991). In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight." *MacGregor*, 786 F.2d at 1053. If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law, that testimony must be accepted as true. *Id.*; *Elam*, 921 F.2d at 1216. The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence. *See MacGregor*, 786 F.2d at 1054; *see also Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## FACTS

T.T.S. was born on December 1, 1995.  He was twelve years old and in the sixth grade at the time of the administrative hearing.  According to T.T.S., he became disabled on August 31, 2005 as a result of his ADHD, depressive disorder, and disruptive disorder.

T.T.S. received treatment for his alleged disability at the Western Mental Health Center ("WMHC").  Dr. Alaa Elrefai was T.S.S.'s treating physician.  Dr. Elrefai's records from July 20

to October 26, 2005 show diagnoses of disruptive disorder, ADHD, and depression.  Dr. Elrefai

gave T.T.S. a Global Assessment of Functioning score ("GAF") of 50[2]–the highest Dr. Elrefai

had observed over the past year.  Dr. Elrefai's notes indicate that Claimant's mother was

concerned about outbursts and restlessness in the classroom setting and Dr. Elrefai addressed

behavioral skills with T.T.S. in the therapy session.  At that time, T.T.S.'s grades were Cs and Ds

and Dr. Elrefai encouraged T.T.S. to have better study habits.

      The Disability Determination Services ("DDS") sent T.T.S. to Dr. Sally A. Gordon on

December 13, 2005 for a consultative evaluation.  Dr. Gordon diagnosed T.T.S. with ADHD and

oppositional defiant disorder.  She noted that T.T.S. had difficulties getting along with authority

figures and peers.  Dr. Gordon also gave T.T.S. a GAF of 50.  Claimant told Dr. Gordon that he

has no friends in his own neighborhood because he is not allowed to play outside without adult

supervision; however, T.T.S. reported to Dr. Gordon that he was friends with most of his

classmates.  T.T.S. also reported that he enjoys playing football and basketball.  Dr. Gordon

stated in her December 2005 assessment that T.T.S. was fully compliant with his medication

regimen at the time.  Dr. Gordon also found that T.T.S.'s symptoms worsened when he was "off

medication."

      Ms. Roslyn McGregory, T.T.S.'s teacher at Wylan Elementary School, completed Child

Development and Functioning Rating and ADHD forms for T.T.S. on January 20, 2006.  Ms.

McGregory noted marked impairments in health and physical well-being, acquiring and using

information, and attending and completing tasks.  Ms. McGregory noted extreme impairments in

---

[2]A GAF score of 50 indicates serious symptoms. *See* American Psychiatric Ass'n,
*Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000).

interacting and relating with others, moving about and manipulating objects, and caring for self. Ms. McGregory wrote on the form "[T.T.S.] is totally out of control [sic] his demeanor is extremely serious and out of control." On the ADHD scale, Ms. McGregory reported that T.T.S. had extreme inattention, extreme impulsiveness, and extreme hyperactivity.

School records indicate that on November 7, 2005 T.T.S. was suspended for battery upon another student. He was suspended again on February 16, 2006 for excessive disruption or distraction of other students, and defiance of a school board employee's authority. On March 2 and March 16, 2006, T.T.S. was suspended for fighting. On May 22, 2006 T.T.S. was suspended for defiance, excessive and repeated disruption of other students, and directing an obscene gesture at a school board employee. On March 19, 2007 T.T.S. was suspended for repeated disruption of students and defiance. T.T.S. was suspended on August 27, 2007 for fighting.

Dr. Elrefai continued to treat T.T.S at the Western Mental Health Center through October 31, 2007. A November 2006 treatment plan from WMHC noted that one of T.T.S.'s weaknesses was medication compliance. Additionally, a December 2006 record from WMHC notes issues regarding T.T.S.'s medical compliance. Dr. Elrefai also noted that T.T.S.'s strict medical compliance and compliance with mental health appointments were important for effective treatment. Furthermore, in both March and July of 2007, Dr. Elrefai reported that T.T.S.'s medical compliance was "sporadic" and she again encouraged his strict compliance with the medicines prescribed and the mental health appointments set.

On October 19, 2006 T.T.S.'s diagnoses included ADHD, disruptive disorder, and depressive disorder. Dr. Elrefai noted that T.T.S. had moderate educational problems in school. On this visit, Dr. Elrefai gave T.T.S. a GAF score of 61. According to Dr. Elrefai, T.T.S.'s  GAF

score ranged from a past year low of 50 to a high score of 65.  Dr. Elrefai compiled a problem list that included 1) behavior/conduct disorder and 2) mood disorder.  T.T.S.'s self-identified barriers included "I play in class, I get in trouble for fighting, I get sad, problems concentrating and remembering things . . . I feel sad because people pick on me and I cry and get angry."  The notes from the October 31, 2007 visit show that T.T.S. was making progress in school and home settings and fewer reports regarding disruptive behavior patterns.

On December 26, 2007, Dr. Elrefai completed Child Development and Functioning rating forms drafted by Claimant's attorney.  By marking an "x" in the corresponding column on the form, Dr. Elrefai indicated that T.T.S. had marked limitations in both acquiring and using information and attending and completing tasks.  Dr. Elrefai also indicated that T.T.S. had an extreme limitation in interacting and relating to others.

T.T.S.'s grades in mid-2007 were in the 50s and 60s for all academic subjects.  A November 20, 2007 progress report showed that T.T.S. had earned a 56 in language arts, 65 in mathematics, 80 in physical education and 70 in reading.  T.T.S. had a 65 in science and a 26 in social studies.  The progress report also indicated that T.T.S. refuses to work.

At the time of the hearing, T.T.S. was taking Concerta once a day as prescribed for ADHD by treating psychiatrist Dr. Alaa Elrefai.  T.T.S.'s medication list also showed that he was taking medication for appetite and weight gain twice a day as prescribed by Dr. Elrefai.  T.T.S.'s mother testified that T.T.S. had no friends in his own neighborhood or at his school.

The ALJ determined the claimant had not engaged in gainful activity since the alleged onset date of disability.  He further found that T.T.S. suffers from the severe impairments of ADHD, disruptive disorder, and depression disorder.  Thus, the claimant met the first two prongs

of the test; but, the ALJ concluded the claimant did not suffer from a listed impairment nor from

an impairment equivalent to a listed impairment.  Thus, the ALJ found T.T.S. not to be disabled

and denied him benefits.

The ALJ concluded that none of T.T.S.'s impairments meet the requirements for a finding

of disability.  Specifically, the ALJ found that T.T.S.'s ADHD is not accompanied by the marked

inattention, marked impulsiveness and marked hyperactivity required under the Listings.

Additionally, the ALJ found that T.T.S.'s depressive disorder is not accompanied by a level of

severity that meets the severity criteria because it does not result in either "marked" or greater

limitations in two of the areas of functioning or an "extreme" limitation in one area of

functioning.  The ALJ also found that Claimaint's disruptive disorder does not fall into any

specific category of mental impairments set out in the Listings.  Accordingly, the ALJ concluded

that T.T.S. does not have an impairment or combination of impairments medically equivalent to

one contained in the Listings.

Next the ALJ evaluated whether T.T.S.'s impairments *functionally* equaled an

impairment in the Listings.  In determining the degree of limitation in each of the six functional

domains, the ALJ considered evidence of T.T.S.'s symptoms and medical opinion evidence.

*Evidence of T.T.S.'s Symptoms*

The ALJ found that inconsistencies in the record reflect that T.T.S.'s impairments are not

of the level of severity described by his mother in her testimony.  Specifically, the ALJ rejected

Ms. Colvin's statements about T.T.S.'s lack of friends as a valid indicator of the severity of

T.T.S.'s impairments because T.T.S. directly contradicted her statements during his examination

by Dr. Gordon.  The ALJ also noted that T.T.S. enjoys playing football and basketball–sports that

11

require a significant amount of interaction with peers.  The ALJ found that T.T.S.'s participation in team sports discredits Ms. Colvin's assertion that T.T.S. is not capable of maintaining a normal level of interaction with his peers.  The ALJ found that Ms. Colvin's statements regarding the severity of T.T.S.'s impairments at the hearing and to other examining sources were not credible and that T.T.S's impairments are not of the level of severity described by Ms. Colvin.

The ALJ also noted that T.T.S.'s treatment records from the Western Mental Health Center contain multiple references showing that T.T.S. had not taken his medicine as prescribed. The ALJ determined that the fact that T.T.S. had not always taken his medication as prescribed shows that neither T.T.S. nor his mother believe that T.T.S.'s impairments are of the level of severity as described by T.T.S. or his mother.

Additionally, the ALJ did not afford significant weight to the Child Development and Functioning Rating and ADHD forms submitted by T.T.S.'s teacher.  The ALJ noted that although the teacher marked blank spaces indicating that T.T.S's functioning was "extreme" or "marked" in certain areas, the forms did not fully define these terms.  The ALJ stated that an "extreme" or "marked" limitation to a lay individual who is unfamiliar with the Regulations would have a distinctly different meaning to an individual familiar with the way those terms are described and defined in the Regulations.

After consideration of the evidence, the ALJ found that T.T.S.'s medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the statements concerning the intensity, persistence, and limiting effects of T.T.S.'s alleged symptoms and functional limitations were not credible.

12

*Medical Opinion Evidence*

The ALJ determined that the low GAF rating of 50 reported by Dr. Gordon was inconsistent with her narrative opinion.  Because of the inconsistency, the ALJ gave greater weight to Dr. Gordon's narrative opinion than to "such a nebulous rating."  Additionally, the ALJ noted that the GAF ratings from T.T.S.'s treating physician ranged from 50 to 61.  Because of the fluidity of the GAF ratings, the ALJ again gave greater weight to the narrative portions of Dr. Elrefai's reports.

Ultimately, the ALJ found that T.T.S. has less than marked limitation in acquiring and using information; attending and completing tasks; interacting and relating with others; and the ability to care for himself.  The ALJ concluded that T.T.S. had no limitation in moving about and manipulating objects and health and physical well-being.  Accordingly, because the ALJ found that T.T.S. does not have an impairment or combination of impairments that results in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning, the ALJ concluded that T.T.S. was not disabled as defined in the Social Security Act.

**DISCUSSION**

**I.  Whether the ALJ erred in finding that T.T.S. consistently had issues with complying with his medication regimen.**

Claimant T.T.S. contends that the ALJ's finding that T.T.S. has a major problem with non-compliance is not documented in the record and cannot be based on substantial evidence. Contrary to Claimant's contention, the record contains several examples of T.T.S.'s non-compliance.  Besides the December 2006 WMHC record noting T.T.S.'s noncompliance, a

November 2006 treatment plan noted that one of T.T.S.'s weaknesses was medical compliance. Additionally, T.T.S.'s records from March 2007 and July 2007 do not show regular medication use; instead, these records describe T.T.S.'s medication compliance as "sporadic."

Claimant notes that Dr. Gordon stated in her December 2005 assessment that T.T.S. was fully compliant at the time. However, the ALJ correctly noted that Dr. Gordon also found T.T.S.'s symptoms worsened when he was "off medication." Dr. Gordon's statement necessarily indicates she was aware of a time when Plaintiff was not compliant with his recommended treatment plan. Because the record contains multiple references to T.T.S.'s noncompliance with his medication regimen, the ALJ's conclusion that T.T.S. had issues with compliance can be supported by substantial evidence in the record.

## II.  Whether the ALJ failed to accord proper weight to the opinion of T.T.S.'s treating physician.

Claimant asserts that the ALJ failed to accord significant weight to the opinion of Dr. Alaa Elrefai, T.T.S.'s treating physician. On December 26, 2007–after the administrative hearing–Dr. Elrefai completed Child Development and Functioning rating forms drafted by Claimant's attorney. By marking an "x" in the corresponding column on the form, Dr. Elrefai indicated that T.T.S. had marked limitations in both acquiring and using information and attending and completing tasks. Dr. Elrefai also indicated that T.T.S. had an extreme limitation in interacting and relating to others. Claimant argues that the forms completed by Dr. Elrefai indicate disability because the forms show marked limitation in at least two domains of functioning and/or the forms show extreme limitation in one domain of functioning. T.T.S. contends that the ALJ should have given substantial weight to Dr. Elrefai's findings and found

14

that T.T.S. is disabled.

"The opinion of a treating physician is entitled to substantial weight *unless good cause exists* for not heeding the treating physician's diagnosis." *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (emphasis added). Here, however, the record contains substantial evidence of good cause to justify the ALJ's decision not to rely on Dr. Elrefai's findings as marked on a prepared form.

Good cause exists when the treating physician's opinion is not supported by the evidence or when the opinion is conclusory or inconsistent with the physician's own medical records. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Thus, the ALJ is required to give a physician's opinion significant weight *unless* the opinion is not well-supported by clinical and laboratory findings, is internally inconsistent, or inconsistent with other evidence. Further, the ALJ does not have to accept conclusory statements by the treating physician over other evidence in the medical records.

Contrary to the Child Development and Functioning rating forms Dr. Elrefai completed, the ALJ found the evidence of record did not show findings of marked inattention, marked impulsiveness, or marked hyperactivity. Moreover, the ALJ found that the evidence showed less than marked or no limitations at all in every domain. The ALJ discussed the generally unremarkable findings in T.T.S.'s WMHC treatment records, including those from Dr. Elrefai. As the ALJ noted, in the August 2005 evaluation Dr. Elrefai completed, T.T.S.'s history showed no acute problems and T.T.S. was calm and cooperative and only *mildly* inattentive. T.T.S. showed normal quality and quantity of speech, had good and directed thought processes, was alert and oriented, had low average intelligence, and had fair memory, fair judgment, and fair

15

insight.  Although T.T.S.'s mother reported that he had behavior problems, the ALJ noted Dr. Elrefai's finding that Ms. Colvin was a "limited historian."  In October 2005, Dr. Elrefai noted that T.T.S. was making progress and Ms. Colvin reported that he was doing better.

The ALJ also noted that Plaintiff's later WMHC treatment records showed his behavior and academic performance improved when he was compliant in taking his mediation.  A December 2005 WMHC record showed that T.T.S. was making progress, was less hyper and less aggressive, was in a stable mood, and was not a problem at home.  A March 2006 record showed T.T.S. was less aggressive and less hyper on medication and Dr. Elrefai noted that T.T.S. was doing "much better" and that his medicine was effective.  An October 2006 treatment note showed T.T.S. was doing fair, showed improvement since taking medication and stable progress both at school and at home, and showed T.T.S. had average academic ability.

T.T.S.'s WMHC treatment records from 2007 also failed to show findings supporting Dr. Elrefai's December 2007 opinion.  To the contrary, a July 2007 record noted improvements in T.T.S.'s academic record, and an August 2007 record showed T.T.S. was progressing at school and at home and receiving fewer reports of behavior problems.  Thus, the record contains evidence of inconsistencies between Dr. Elrefai's December 2007 assessment of the severity of T.T.S.'s functional limitations and Dr. Elrefai's other treatment records; accordingly, good cause to discredit existed and the ALJ did not have to accord significant weight to Dr. Elrefai's December 2007 assessment.

Plaintiff also argues that the court should reverse the ALJ decision because he failed to give significant weight to Dr. Elrefai's treatment records that showed T.T.S. had a GAF score of 50–a score consistent with the opinion of impartial DDS consultative psychologist, Dr. Sally

16

Gordon.  However, the ALJ found that these findings, although consistent with each other, were nevertheless inconsistent with other medical evidence of record; thus, the ALJ did not err when he did not give significant weight to these opinions.

As discussed above, T.T.S.'s WMHC records often noted T.T.S.'s stable moods, average academics, and improved behavior.  Dr. Gordon's own exam showed generally normal mental findings.  Additionally, the ALJ noted that Dr. Gordon's GAF score of 50 was inconsistent with T.T.S.'s other GAF scores contained in the evidence of record.  On December 2, 2005, less than two weeks prior to Dr. Gordon's assessment, T.T.S. had a GAF score of 55, indicating only moderate symptoms.  An October 19, 2006 record shows T.T.S. had a GAF score of 61 and in the past year had a score of 65, both indicating only some mild symptoms and improvements.

The ALJ also found Dr. Gordon's GAF score of 50 was inconsistent with her own narrative assessment.  Despite assigning a score indicating serious symptoms, Dr. Gordon stated that T.T.S. showed only mild to moderate depression.  Dr. Gordon also stated that Plaintiff showed intact expressive and receptive language skills, intact memory, average intellect, and earned average grades.  Because the GAF scores of 50 were inconsistent with other medical evidence contained in the record, the ALJ did not err by according less weight to the low scores.

### III.  Whether the ALJ made improper credibility determinations

*Ms. Colvin's testimony*

Claimant also contends that the ALJ's finding Ms. Colvin not credible cannot be based on substantial evidence because the ALJ improperly based his credibility findings on inconsistencies between Ms. Colvin's and T.T.S.'s statements.  Claimant correctly points out that substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a

17

conclusion." *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).  However, the ALJ

may consider inconsistencies between testimony and other evidence in evaluating the credibility

of testimony regarding the severity of symptoms. *See* 20 C.F.R. § 416.929(c)(4).  Additionally,

Claimant has not provided any caselaw requiring an ALJ to disregard the statements of a child

merely because he is a child.  While some might not find a twelve year old child's testimony

credible, the ALJ in the instant case found T.T.S.'s statements both credible and consistent with

other evidence in the record.  However, the record contains evidence that is inconsistent with Ms.

Colvin's testimony about the severity of T.T.S.'s functional limitations; therefore, the ALJ did

not err when he discredited her testimony based on these inconsistencies.  Because the ALJ's

credibility determination is based on substantial evidence–inconsistencies between Ms. Colvin's

testimony and other evidence of record–this court will not disturb the ALJ's articulated

credibility finding.

*Child Development and Functioning rating forms completed by Ms. McGregory– T.T.S.'s
teacher*

Contrary to Claimant's contention, the ALJ properly gave less weight to the opinion

evidence of T.T.S.'s teacher Ms. Roslyn McGregory.  On January 20, 2006, Ms. McGregory

completed a form drafted by T.T.S.'s attorney.  She checked off "marked" or "extreme"

limitations in every functional domain and "extreme" problems with inattention, impulsiveness,

and hyperactivity.  As the ALJ discussed, the terms "marked" and "extreme" refer to specific

regulatory definitions not fully described on the form Ms. McGregory completed.  Thus, Ms.

McGregory's opinion of whether a functional limitation is "marked" or "extreme" does not

necessarily coincide with the definition of those terms as described by the Regulations.

Accordingly, the ALJ was not required to accord significant weight to Ms. McGregory's non-medical opinion that was likely based on inaccurate definitions of the terms "marked" or "extreme."

Additionally, even if Ms. McGregory applied the correct definitions of the terms on the Child Development and Functioning rating form, the ALJ did not err in discrediting Ms. McGregory's report because, as discussed above, her assessment is contradicted by the evidence. Moreover, the ALJ found that the information Ms. McGregroy provided on the rating form could not be afforded significant weight because the information was merely conclusory determinations of issues reserved for the Commissioner.  "Whether a claimant meets the statutory definition of disability is an administrative finding determined by the Commissioner." *Sanabria v. Commissioner of Social Sec.*, 303 Fed. App'x 834, 839 (11th Cir. 2008) (citing 20 C.F.R. § 404.1527(e)).  Thus, the court concludes that substantial evidence exists to support the ALJ's decision to give little weight to the opinion of Ms. McGregory.

## CONCLUSION

For the reasons stated above, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED.


DONE and ORDERED this 22nd day of March, 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE